UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| ANGELA GRISHAM, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:06-CV-251 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| LIFE INSURANCE COMPANY OF | ) | |
| NORTH AMERICA, and CIGNA | ) | |
| COMPANIES LONG TERM DISABILITY | ) | |
| PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM**

This is a lawsuit brought by Angela Grisham ("Plaintiff") against Life Insurance Company of North America and CIGNA Companies Long Term Disability Plan ("Defendants") for disability benefits pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. Before the Court are three motions: Plaintiff's motion for judgment on the administrative record or, in the alternative, to remand to Defendant for another claims determination (Court File No. 17); Defendant's motion for judgment on the administrative record, and to oppose Plaintiff's motion for judgment on the administrative record (Court File No. 20); and, Plaintiff's motion for judicial notice or, in the alternative, to expand the record (Court File No. 22). This Court also considers the other motions filed in opposition to the motions above (Court Files Nos. 24, 25, 26).

For the foregoing reasons, this Court **DENIES** Plaintiff's motion for judicial notice and to expand the record; **GRANTS** Defendant's motion for judgment on the administrative record; **DENIES** Plaintiff's motion for judgment on the administrative record as it pertains to short-term disability benefits; and, **DENIES** as moot Plaintiff's motion as it pertains to long-term disability

benefits.

I.      **FACTS AND PROCEDURAL HISTORY**

A.      **Plaintiff's Employment and Illness History**

Plaintiff was employed as an administrative assistant or "executive secretary" to the Service Center Leader at CIGNA's Chattanooga location (Court File No. 2, Am. Compl., ¶ 5; Admin. R. ("A.R.") at 86). Plaintiff began her employment in March 2002 (Court File No. 18, Mem. in Supp. of Pl.'s Mot. for Summ. J. on A.R., p. 1).

In March 2003, Plaintiff appears to have taken a brief period of short-term disability leave (A.R. at 73-78). On June 12, 2003, Plaintiff left work due to "devastating" pain (Court File No. 17, p. 2), and did not return. Plaintiff suffers from nephrolithiasis or kidney stones (Court File No. 2, ¶ 8). This condition causes pain, decreased renal functioning, and sometimes depression and/or disordered sleep (*id*. ¶¶ 9-11). Plaintiff's treatment has included narcotic painkillers (*id*. at ¶ 9), lithitripsies,[1] nephrostomy drainage tubes,[2] and ureteral stents (Court File No. 18, p. 3-4) (citing multiple records in A.R.).[3]

Plaintiff developed a 3.5 cm kidney stone, which could not be passed and required multiple

---

[1] A lithotripsy or "Extracorporeal Shock Wave Lithotripsy" ("ESWL" in Plaintiff's medical records) uses sound waves to break a kidney stone into pieces that can more easily travel through the urinary tract and pass from the body. *See* http://www.webmd.com/kidney-stones/extracorporeal- shock-wave-lithotripsy-ESWL-for-kidney-stones; Court File No. 18, p. 1 (defining "lithotripsy treatment" as "the introduction of high-intensity acoustic waves designed to break the calculi into segments small enough to be passed through the urine").

[2] A "nephrolithotomy" is a procedure by which a surgeon creates a tunnel through the back and directly into a patient's kidney; after such a procedure, patients may have a small tube left in the kidney to assist healing. *See* http://www.webmd.com/kidney-stones/percutaneous-nephrolithotomy-or-nephrolithotripsy-for-kidney-stones#hw204524; Court File No. 18, p. 1 (defining "nephrostomy tubes" as "hollow tubes inserted directly into the kidney through a patient's back").

[3] A stent is used to hold the ureter open and help drain urine and stone pieces which moved to the ureter. *See* http://www.webmd.com/kidney-stones/kidney-stones-treatment-overview.

lithotripsies to break up the fragments (A.R. at 197). Plaintiff's doctor sent a letter to CIGNA's claims manager summarizing Plaintiff's treatment. According to Dr. David A. Sahaj ("Dr. Sahaj"), treatment began on June 23, 2003 with ureteral stenting followed by ESWL (*id.*). Although Plaintiff had "excellent fragmentation" of the large stone, she "developed a right ureteral steinstrasse . . . complicated by an episode of stent obstruction and right sided pyelonephritis" (*id.*).[4] Plaintiff was hospitalized because of this infection from July 31, 2003 to August 6, 2003, and her stent was replaced by a nephrostomy tube (*id.*).

Plaintiff underwent additional ESWL procedures on August 19,[5] August 29, September 19, and October 10, 2003 (A.R. at 197, 248). Plaintiff had an office visit on September 15, 2003 (A.R. at 247), and was briefly hospitalized to replace her nephrostomy tube on September 19, 2003 (A.R. at 197). In early October, Plaintiff underwent ureteroscopic extraction of stone fragments, had the nephrostomy tube removed, and the stent replaced (*id.*). At the time of Dr. Sahaj's letter, Plaintiff still had a stent in place to finish clearing stone fragments from her ureter. Dr. Sahaj "anticipate[d] her either passing her residual stones or having them removed endoscopically in the near future" and also "anticipate[d] several more weeks in total with a [*sic*] ureteral stent" (*id.*). This letter is the most recent record in Plaintiff's claim file.

### B.   The Disability Benefits Plan

---

[4] "Steinstrasse" is a "well-known complication of ESWL" and "refers to the column of stone fragments that can develop within the ureter" after lithotripsy. *See Reuters Health*, *Tamsilosin May Aid in Resolution of Steinstrasse After Lithotripsy*, Dec. 26, 2006, at http://www.medscape.com/view article/520498 (citing research study in *Urology*, Nov. 2006 issue). "Pyelonephritis" is a kidney infection. *See* http://www.webmd.com/a-to-z-guides/understanding-urinary-tract-infections-basics.

[5] Although Dr. Sahaj's letter to Cigna Health Care, dated October 20, 2003, states Plaintiff had an ESWL procedure on August 18, 2003 (A.R. at 197), the relevant "Operative Report" in the record is from August 19, 2003 (A.R. at 248). Since the Operative Report was created the day of the procedure, the Court will use August 19, 2003 as the date of the procedure.

3

As a benefit, CIGNA provided its employees with short- ("STD") and long-term ("LTD") disability coverage under a plan funded by CIGNA and administered by the Life Insurance Company of North America, a CIGNA subsidiary. This "Plan" pays STD benefits to an employee with a "covered disability that begins at a time when [the employee] ha[s] STD Plan coverage." (A.R. at 6). The parties do not dispute Plaintiff had STD Plan coverage under the Plan, but dispute whether Plaintiff had a "covered disability." The Plan defines this as:

> [I]f, because of a medical condition related to an accident, illness or pregnancy:
>
> - You are unable to perform the essential functions of your current or a similar role for at least six consecutive scheduled work days;
> - The essential duties that you cannot perform cannot be reassigned to another person in order to accommodate your return to work;
> - You cannot, based on your lack of work experience or on work restrictions related to your medical condition, be reassigned to another position within 15% of the market value of your current role; and
> - Your physician provides objective medical evidence to support his or her assessment of your medical condition.

(*Id.*).

The Plan provides for the termination of benefits at the earliest of:

- You refuse or discontinue medical treatment that is necessary for your recovery . . . ;
- Your physician releases you to return to work;
- Your disability is no longer a covered disability; . . .
- You are unable to provide satisfactory medical evidence of a covered disability; . . . or
- You refuse or fail to comply with Disability Management Solutions in the administration of the claim, including but not limited to, failing to provide information or documents needed to determine whether benefits are payable or the actual benefit amount due, or providing false information.

(*Id.* at 9).

### C. Procedural History of Plaintiff's Claim

4

Plaintiff filed a claim for STD benefits on June 23, 2003, using "kidney stones" as her disabling condition (Court File No. 17, p. 2; A.R. at 177). Her application was initially approved (A.R. at 90). However, by letter dated September 24, 2003, Defendant terminated Plaintiff's benefits, effective September 1, 2003 (A.R. at 124). This letter cites the following reasons for the termination:

> [T]here must be medical evidence that supports your inability to perform your essential job duties. Based on documentation regarding your position as an Executive Secretary, your duties are sedentary in nature. We consider medical evidence that supports a disability to be a measurable abnormality, which is evidenced by one or more standard medical diagnostic evaluations . . . that support and substantiate the presence of a physical condition that would result in a functional limitation significant enough to preclude an individual from performing the essential duties of their [*sic*] job or reasonable temporary accommodations . . . . You were advised on September 10, 2003 that additional medical [evidence] [*sic*] was needed by September 14, 2003 to consider benefits beyond August 24, 2003. We received and reviewed a packet of records from Dr. Sahaj on September 12, 2003 with his most recent note the lithotripsy completed on August 29, 2003. No additional office notes, test results or specialist visits were received beyond August 29, 2003. In summary, we have received no objective medical information to support that you are totally disabled from your sedentary position as an Executive Assistant. We have further approved your claim to August 31, 2003 and benefits are denied as of September 1, 2003.
>
> At this point in time, you do not satisfy the definition of disability as defined by the plan and we must deny your claim.

(A.R. at 124-25). The letter included instructions on how to appeal.

Plaintiff appealed in a letter dated October 27, 2003 and supported by records dated through October 13, 2003; Plaintiff also stated she had two surgeries that had not yet been dictated but which would be faxed to Defendant as soon as Plaintiff had a follow-up appointment (A.R. at 131). Despite these new records, Plaintiff's appeal was finally denied on November 25, 2003 (A.R. at 134) ("Final Denial"). The Final Denial letter cites the following reasons for affirming the termination of benefits: there were no clinical findings

5

to support Plaintiff's inability to perform the essential functions of her sedentary position; Plaintiff's doctor opted to "leave the issue [determining Plaintiff's disability] between [Plaintiff] and CIGNA"; and an independent medical consultant who reviewed Plaintiff's file found no evidence that Plaintiff could not work in a sedentary position with a stent or nephrostomy tube in place and while taking painkillers (*id.* at 134-35).

### D. E-mail from Plaintiff's Supervisor

The Defendant's claims administration unit communicated with Plaintiff's supervisor, Michele Powers ("Powers") on several occasions. The claims manager first e-mailed Powers to obtain Plaintiff's telephone number and other information; this is required by the Plan. Powers updated the claims unit on Plaintiff's condition as she received news from Plaintiff (A.R. at 85).

On September 11, 2003, Powers e-mailed the claims Team Leader a bullet-point list of "issues" involving Plaintiff (A.R. at 92-93). These issues include: (a) Powers' intent to terminate Plaintiff as soon as she returned to work; (b) contents of telephone discussions between Powers and Plaintiff concerning Plaintiff's treatment; (c) repeated tardiness of Plaintiff's medical records to her claims manager; (d) an incident when Plaintiff brought keys to Powers' office and appeared highly medicated; (e) reports from unnamed employees that Plaintiff was seen in bars during the period when she claimed to be disabled; and, (f) Plaintiff's use of a corporate credit card in a distant location while on STD leave (*id.*). Finally, it contains Powers' personal views on the situation:

> I don't doubt that Angie is ill and has a kidney stone. What I do believe is her treatment isn't being managed aggressively by her doctor, that she's not helping herself . . . and I believe she's able to work for at least short hours particularly if she can be seen in a bar at night. I also suspect that due to connections she has in the medical field . . . she's getting some help stretching out this disability particularly

6

since she knew she was close to termination . . . . Lastly, I now believe she is working, at least under the table . . . She's always freely shared with me she lives paycheck to paycheck so it's hard for me to believe she can live off 60% disability payments, own her own home and drive a Mercedes convertible on 60% of a 40K salary!

Thanks for any help you can provide here. I'm doing this because I really feel the company is being taken for a ride here.

(*Id*. at 92).

## II. STANDARD OF REVIEW

The Court's review is limited to the record before the Plan's administrator. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). Here, as is undisputed by the parties, "[t]he Benefit Administrator has the sole discretion to determine whether [an individual is] eligible for benefits under the CIGNA Short-Term Disability Plan and the amount of any benefit to which [an individual] might be entitled, as well as to interpret any of the plan's provisions, including ambiguous and disputed terms and to make any related factual determinations." (A.R. at 14; Court File No. 24, p.1). Where such discretionary authority is granted, "the highly deferential arbitrary and capricious standard of review is appropriate." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Glenn v. Metro. Life. Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006) (applying *Firestone*). This standard is "the least demanding form of judicial review." In fact, the Court must defer to the administrator's decision as long as it was "rational in light of the plan's provisions," *Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 302 (6th Cir. 2006), and as long as there is "a reasoned explanation, based on the evidence" to support the outcome, *Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 240 (6th Cir. 1996) (citation omitted). At the same time, "[w]hile the arbitrary and capricious standard is deferential, it is not . . . without some teeth." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876

7

(6th Cir. 2006) ("federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions"). The Court's obligation under this standard "includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id*.

## III. DISCUSSION

### A. Plaintiff's Motion for Judicial Notice

Plaintiff has requested that this Court take judicial notice of the following three statements: "Kidney stones are an extremely painful condition"; "Mepergan is a powerful narcotic prescribed for pain"; and, "Percocet is a powerful narcotic prescribed for pain." (Court File Nos. 22, 23). Pursuant to Federal Rule of Evidence 201(d), "a court shall take judicial notice if requested by a party and supplied with the necessary information." "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).

Plaintiff provides facsimiles of three websites and an unanalyzed string citation of over a dozen cases to support judicial notice of the statement: "Kidney stones are an extremely painful condition." (Court file No. 23, p. 3, Exhibits 1-3). After reviewing the scientific resources Plaintiff has submitted, this Court must decline to do so. Plaintiff's scientific sources do not support the statement that "kidney stones are an extremely painful condition." The National Kidney Foundation writes "[s]ome people may not have any symptoms, but most have at least some, such as. . .[s]evere pain in the kidneys or lower abdomen, which may move to the groin; pain may last for minutes or hours, followed by periods of relief. . ." (Court File No. 23, Exhibit 1). The Mayo Clinic writes "[passing kidney stones] can be excruciatingly painful.. . .Not all kidney stones cause symptoms."

(*Id.*, Exhibit 2). From these sources, one concludes people passing kidney stones usually experience varying degrees of pain; they do not support Plaintiff's assertion.

Furthermore, even if the Court could take judicial notice "kidney stones are an extremely painful condition," the relevant question would remain unanswered: did Plaintiff personally experience pain "extreme" enough to prevent her from returning to work, even in a limited capacity and with the assistance of painkillers, at all times after June 12, 2003? To prove her disability, Plaintiff must still point to evidence in the record specific to her. *See Wilkins*, 150 F.3d at 616; *Yeager*, 88 F.3d at 381.

Plaintiff's other assertions are equally unpersuasive. If the Court were to take judicial notice "Mepergan is a powerful narcotic prescribed for pain" and "Percocet is a powerful narcotic prescribed for pain," the Court would still need to investigate whether these "powerful narcotics" sufficiently alleviated Plaintiff's pain to allow her to return to work, and whether the narcotics themselves made her incapable of returning to work. These determinations require medical expertise best left to the medical personnel examining Plaintiff and Plaintiff's records. This is precisely why an administrative record is collected and provided to the Court. The Court **DENIES** Plaintiff's motion for judicial notice.

B.    **Plaintiff's Motion for Expansion of the Record**

Plaintiff, in the alternative, has asked this Court to expand the record to include the medical articles discussing kidney stones and Plaintiff's medications. (Court File Nos. 22, 23). The Court is unable to do so. This Court must conduct its review "based solely upon the administrative record," unless the additional evidence is "offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007),

*rehearing en banc denied* September 26, 2007; *Wilkins*, 150 F.3d at 619. Since this evidence does not pertain to any claim of a lack of due process or alleged bias, this Court **DENIES** Plaintiff's motion in the alternative.[6]

C. **Judgment on the Administrative Record**

1. **Conflict of Interest and Bias**

Plaintiff alleges Defendant's decision was influenced by a bias and conflict of interest because (1) Defendant, acting as both payer and administrator of the Plan, has financial bias against awarding Plaintiff disability benefits, and (2) Defendant was improperly influenced by e-mails from Michelle Powers, Plaintiff's immediate supervisor, expressing skepticism of Plaintiff's disability to the claims department (Court File Nos. 17, 18).

a. **Financial Conflict of Interest**

A conflict of interest exists when, as here, Defendant both funds the plan and decides whether to award benefits. *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998). A conflict of interest does not require a court to depart from the arbitrary and capricious standard of review; rather, it is a factor to consider in a court's evaluation. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston,* 419 F.3d 501, 506 (6th Cir. 2005). Mere allegations of a conflict are not sufficient; there must be "significant evidence" the apparent conflict affected the administrator's decision to deny benefits. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998); *Wages v. Sandler O'Neill & Partners, L.P.*, 37 F. App'x 108, 112 (6th Cir. 2002). The

---

[6] The Court would also be hesitant to add Plaintiff's documents to the record for practical reasons; as explained above, the new information does nothing more than reinforce the need of the Court and the Plan administrator to return to the administrative record to make determinations as to Plaintiff's specific pains and capacities.

court's ultimate determination is whether the conflict improperly influenced the insurer's actions towards the insured. *Killian*, 152 F.3d at 521.

Plaintiff has failed to provide significant evidence to demonstrate that Defendant's decision was based upon financial concerns, rather than medical facts. Plaintiff cites *Killian* to support its claim of improper bias (Court File No. 18). The facts before the Court are not analogous. In *Killian*, the insurer refused additional medical evidence favoring pre-authorization of a procedure while it continued to review evidence opposing authorization. 152 F.3d at 521-22. The court held that such behavior was irrational unless explained by improper financial motives. *Id.*

Here, Defendant's behavior lacked the blatant bias in *Killian*, and is more akin to the situation in *Nicholas v. Standard Ins. Co.*, 48 Fed.App'x. 557, 565 (6th Cir. 2002). In *Nicholas*, the insurer encouraged the insured to submit information supporting the insured's inability to perform his occupational duties, and sought and reviewed information both in support and opposition of granting the claim. *Id.* The court recognized any alleged lack of evidence in the record was due to the insured's failure to submit such evidence. *See id.*

Here, Defendant made clear to Plaintiff she was ultimately responsible for ensuring that it received the necessary records to support her disability claim. Defendant's initial solicitation for information to Plaintiff on June 24, 2003 clearly states "[p]lease note that we are pursuing the information needed to make a decision on your claim. However, in the event that we are unable to obtain this information, it is your responsibility to provide us with the required information. Please contact your physicians and ask that they cooperate with us and respond to our requests as soon as possible." (A.R. at 79). Again, on September 10, 2003, Defendant contacted Plaintiff when additional information from her doctor was not forthcoming, asking "[p]lease contact your physician's office to advise them to respond to our request" (A.R. at 90). In the denial letter,

Defendant reiterated that a requirement of receiving benefits was "[y]our physician provid[ing] medical evidence to support his or her assessment of your medical condition" (A.R. at 124).

Furthermore, Defendant spoke with Dr. Sahaj, Plaintiff's primary physician on October 3, 2003, prior to rejecting Plaintiff's appeal (A.R. at 134). Dr. Sahaj was advised of Plaintiff's occupational demands and informed Plaintiff would not receive benefits if she was not able to provide medical evidence to support her claim of disability. Dr. Sahaj, having been apprised of the seriousness of a failure to provide adequate medical evidence, did not claim Plaintiff would be unable to perform her employment duties, but rather responded "he would leave the issue between [Plaintiff] and CIGNA" (*id.*). This Court does not venture to guess, as both parties have, at to the motivation or underlying meaning of Dr. Sahaj's response. However, the Court does recognize Defendant's attempt to gather more information from a first-hand source, behavior in stark contrast to the insurer in *Killian*. *See* 152 F.3d at 521-22.

Plaintiff has not put forth any evidence Defendant was actively trying to deny her claim. *Cf. id.* Upon review of the full record, this Court finds no evidence Defendant was improperly influenced by financial motives.

### b. Bias due to Powers' E-mail

Plaintiff expressed ample concern Powers' e-mails predisposed Defendant to deny her disability benefits (Court File No. 18, 24). Again, such bias does not require a court to depart from the arbitrary and capricious standard, but is a factor in the court's consideration. *Kalish,* 419 F.3d at 506. "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 363

(6th Cir. 2002). The Court must consider the potential bias of Powers' e-mail in light of the entire record. *See Evans v. UnumProvident Corp.*, 434 F.3d 866, 880 (6th Cir. 2006).

Plaintiff erroneously claims the facts in *Evans v. UnumProvident Corp.* are identical to those here. There, e-mails among customer care specialists expressed they were "working on denying this claim." *Id.* Although this was a factor in the court's consideration, the reversal of the denial was based upon the entire record, which included (a) a failure to seek independent medical review of the claim, (b) selective review of the medical reports on the record, (c) misrepresentation of the facts, and (d) a failure to acknowledge the documented impairments of the insured in relationship to the demands of her job. *Id.* at 879-80. Here, Powers' e-mail, although skeptical of the extent of Plaintiff's claimed disability, does not improperly demand dismissal of Plaintiff's claim, nor has it been shown Powers had any authority in having the claim dismissed (A.R. at 92-93). More importantly, Plaintiff has failed to provide evidence of a gross mismanagement of the information in the record and during the decision-making process, as occurred in *Evans v. UnumProvident Corp. See id.*

The facts here are significantly similar to those in *Evans v. Metro. Life Ins. Co.*, 190 Fed.App'x. 429, 434 (6th Cir. 2006). There, employees informed the insurer that the insured was motorcycle riding, jet skiing, and working on cars while claiming to be disabled. *Id.* The administrative record contained a note reiterating these unsubstantiated allegations; however, the Sixth Circuit Court of Appeals held the insurer's denial was not arbitrary and capricious because "there was no evidence on the record to suggest that [the insurer] gave any credence to the report." *Id.* Similarly, although one document in the record refers to Plaintiff's alleged extra-circular activities in relation to her disability claim (A.R. at 196), there is no evidence Defendant relied upon that information when denying Plaintiff's claim. To the extent Powers' e-mail may have encouraged

a detailed review of Plaintiff's claim, there is no evidence on the record to show the ultimate denial of the claim was arbitrary and capricious. Having reviewed the full record, this Court finds no evidence Defendant was improperly influenced by Powers' e-mail.

### 2. Plaintiff's Short-Term Disability on the Record

The Court considers whether, based on the evidence in the record, the administrator's decision is rational. *Osborne*, 465 F.3d at 302; *Wilkins*, 150 F.3d at 616; *Yeager*, 88 F.3d at 381. Defendant terminated Plaintiff's STD benefits on September 1, 2003. This Court must consider whether there is a rational basis in the record to support Defendant's decision to terminate Plaintiff's benefits on that date. *See Osborne*, 465 F.3d at 302. This Court can only grant Plaintiff's motion for STD benefits if no rational basis exists in the record. *See id.*

#### a. Evidence of Disability on the Record

By the terms of the Plan, Defendant can terminate STD benefits if Plaintiff failed to provide objective medical evidence to support her disability claim (A.R. at 6). Defendant's denial was based on a lack of sufficient evidence to support a claim of disability after August 31, 2003 (A.R. at 134-136). Upon reviewing the record, this Court has found no records for the span of time between August 29, 2003 and September 19, 2003 showing Plaintiff was unable to return to work.

Plaintiff received an ESWL operation on August 29, 2003 (A.R. at 244). Plaintiff's next ESWL operation was on September 19, 2003 (A.R. at 248), with an office visit on September 15, 2003 (A.R. at 247). There were no procedures or pain-management problems documented between August 29, 2003 and September 19, 2003, and the record contains no documentation to support a disability for the entirety of that period. Without such contradictory evidence, Defendant's decision to terminate Plaintiff's benefits was not arbitrary and capricious.

#### b. Independent Review of Incomplete Record

Defendant commissioned an independent review of Plaintiff's disability claim in conjunction with Plaintiff's appeal (A.R. at 135). However, the independent consultant neglected to include Plaintiff's August 29, 2003 ESWL procedure in the report (*see id.*). Ignoring that procedure, the independent consultant's review acknowledged Plaintiff was "transiently totally impaired with the August 19, 2003 procedure," but found medical evidence lacking to support disability until the September 19, 2003 procedure (*id.*).

To warrant reversal where an independent consultant's review of the case was made based upon an incomplete record, Plaintiff must demonstrate how the shortcoming in the consultant's report made Defendant's ultimate denial arbitrary and capricious. *See Spangler*, 313 F.3d at 363 ("[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious."); *see also Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005)(the court must "ask whether, in light of the administrative record as a whole, the explanation for the decision to deny or terminate benefits is rational.") Therefore, the Court must consider, in light of the entire record, whether the missing information fundamentally undermined the consultant's report, and whether, without the report, Defendant's decision was arbitrary and capricious.

Although flawed, the independent report still weighs against Plaintiff's disability. Plaintiff submitted no evidence into the record to address the independent consultant's primary concerns: there was insufficient evidence to support (a) the stent and/or nephrostromy tube made Plaintiff unable to perform sedentary work, and (b) the effects of the prescribed painkillers prevented her from returning to work (A.R. at 135). Plaintiff has shown that the consultant was in error, as the August 29, 2003 procedure provides evidence Plaintiff was disabled at some point between her

15

August 19, 2003 and September 19, 2003 procedures (A.R. at 244). However, Plaintiff did not provide medical records or a doctor's analysis to support a disability for all or part of the twenty-one days between her August 29, 2003 and September 19, 2003 procedures.

Defendant did consider Plaintiff's August 29, 2003 procedure in its original denial of benefits (A.R. at 125), and considered it when evaluating the full record on appeal (A.R. at 134-136). "The Appeals Committee concurred with the decision of the case manager that based on the medical information available there were *no clinical findings* to support your inability to perform the major job functions of your position as an Executive Secretary." (A.R. at 134)(emphasis added). Without evidence to the contrary, it is not arbitrary and capricious for Defendant to determine Plaintiff could have returned to work at some point within the twenty-one days after her August 31, 2003 procedure. The lack of evidence of Plaintiff's disability in the record supports a rational basis for denying benefits.

Furthermore, the records most relevant to Plaintiff's pain and potential limitations around the date of termination, September 1, 2003, provide a rational basis for Defendant's decision. As examples, Plaintiff's August 18, 2003 discharge instructed her to "[r]eturn to regular activity" after 24 hours (A.R. at 275). Her evaluation on August 25, 2003 shows her pain as "moderate" (a 4 out of 10) and instructs her to "return to the same environment," without marking that she would "require additional assistance" (A.R. at 322). As previously stated, this Court's review of the record found no medical reports accounting for the period between August 31, 2003 and September 14, 2003. However, periods documented shortly after September 14, 2003 provide a rational basis to believe that Plaintiff was not disabled. For example, Plaintiff's office visit on September 30, 2003 ended with routine discharge; only restricted Plaintiff's activities for twenty-four hours; and, did not require follow-up care for another one to two weeks (A.R. at 505).

Defendant's independent consultant report was flawed. However, the medical evidence on record and the reasoning of the consultant's report still provide a rational basis for Defendant's decision. The facts before this Court bare no similarities to the case law dealing with medical reviews based on partial records, because Defendant's decision was not contradicted by other substantial evidence, *cf. Spangler*, 313 F.3d at 362, and was based on the entire record, rather than solely on one flawed determination, *cf. Moon*, 405 F.3d at 381-82.

In *Spangler*, the insurer sent the independent reviewer a partial record, lacking numerous medical reports and an evaluation from Plaintiff's doctor, all of which supported a finding of disability. 313 F.3d at 362. The court held the denial was arbitrary and capricious because the insurer based its denial on the questionable independent review even though "virtually all of the evidence in the administrative record show[ed] that [the plaintiff was] disabled from working." *Id.*

In *Moon*, a doctor employed by Unum found that the plaintiff was not disabled, focusing on one minor medical report and ignoring all other medical evidence and numerous reports by other doctors supporting plaintiff's disability. 405 F.3d at 381-82. The Court held that Unum acted arbitrarily and capriciously in its rejection of the plaintiff's claim based solely on that report. *Id.*

This Court must determine whether the evidence in the administrative record provides a rational basis for Defendant's decision to deny Plaintiff's disability benefits. *See Moon*, 405 F.3d at 381; *Wilkins*, 150 F.3d at 616; *Yeager*, 88 F.3d at 381. In light of the above analysis, the Court has no basis to hold Defendant's decision to deny benefits was arbitrary and capricious. This Court **DENIES** Plaintiff's motion to grant her short-term benefits based upon the administrative record.

### 3. Long-term Disability Benefits

According to the LTD Plan, LTD benefits begin at the end of a waiting period consisting of twenty-six weeks of STD benefits (A.R. at 17). Since Plaintiff did not receive STD benefits for

twenty-six consecutive weeks as required under the Plan, Plaintiff was not eligible for LTD benefits under the terms of the Plan. The Court **DENIES** as moot Plaintiff's motion concerning LTD benefits.

## IV. CONCLUSION

For the reasons discussed above, this Court **DENIES** Plaintiff's motion for judicial notice and to expand the record; **GRANTS** Defendant's motion for judgment on the administrative record; **DENIES** Plaintiff's motion for judgment on the administrative record; and, **DENIES** as moot Plaintiff's motion as it pertains to long-term disability.

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**